**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JOSEPH SAMOZA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TRANS UNION LLC,<br><br>Defendant. | Case No. 25-cv-10561<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff Joseph Samoza ("Plaintiff"), individually, and on behalf of all others similarly situated (collectively, "Class members"), by and through his attorneys, brings this Class Action Complaint against Defendant Trans Union LLC ("TransUnion" or "Defendant"), and complains and alleges upon personal knowledge as to himself and information and belief as to all other matters.

## INTRODUCTION

1. Plaintiff brings this class action against TransUnion for its failure to secure and safeguard approximately 4,461,511 individuals', including Plaintiff's, personally identifiable information ("PII"), including names, dates of birth, Social Security numbers, billing addresses, email addresses, phone numbers, reasons for customer transactions, and customer support tickets and messages.

2. TransUnion is one of the three largest consumer credit reporting agencies in the United States and has its headquarters in Chicago, Illinois.

3. On or about July 28, 2025, an unauthorized third party gained access to some of TransUnion's data that was stored on a third-party application and accessed and acquired files

containing the PII of TransUnion's customers, including Plaintiff and Class members (the "Data Breach").

4. TransUnion owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against unauthorized access and disclosure. TransUnion breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect Plaintiff's and Class members' PII from unauthorized access and disclosure.

5. As a result of TransUnion's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of himself and all persons whose PII was exposed as a result of the Data Breach.

6. Plaintiff, on behalf of himself and all other Class members, asserts claims for negligence, negligence per se, violations of the California Unfair Competition Law, and violations of the California Consumer Privacy Act, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## **PARTIES**

***Plaintiff Joseph Samoza***

7. Plaintiff is a citizen and resident of California.

8. In connection with its credit reporting services, TransUnion obtained Plaintiff's PII.

9. At all relevant times, TransUnion stored and maintained Plaintiff's PII on its network systems, including the third-party application impacted in the Data Breach.

10. Plaintiff received a notice letter on September 2, 2025, from TransUnion notifying him that his PII was in the files accessed and acquired by an unauthorized third party in the Data Breach.

11. Since the Data Breach, Plaintiff has experienced a significant increase in the number of spam calls he receives.

12. As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII; time and effort lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of his PII.

***Defendant Trans Union LLC***

13. Defendant Trans Union LLC is a limited liability company organized in Delaware with its principal place of business located at 555 W. Adams Street, Chicago, IL 60661. Trans Union LLC may be served through its registered agent, Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, IL 62703.

## JURISDICTION AND VENUE

14. The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

15. This Court has general personal jurisdiction over Defendant because it maintains its principal place of business in this District.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of TransUnion*

17. TransUnion is a credit reporting agency that was formed over 50 years ago. Along with Experian and Equifax, TransUnion is one of the three largest credit reporting agencies in the United States.

18. In the regular course of its business, TransUnion collects and maintains the PII of many consumers throughout the United States, including Plaintiff and Class members. TransUnion requires this PII, including the PII stolen in the Data Breach, to perform its function as a credit reporting agency.

19. TransUnion is well aware of the harms that a data breach can cause. On its website, TransUnion states, "A data breach can put your digital identity and personal information at risk."[1]

20. TransUnion also recognizes on its website that the number of data breaches that occur each year is increasing and should have been aware that a data breach could occur.[2]

21. Plaintiff and Class members are consumers who trusted that one of the three main credit reporting agencies would protect their PII.

### *The Data Breach*

22. On or about July 28, 2025, an unauthorized third party gained access to TransUnion's data through a third-party application and accessed and acquired the PII of Plaintiff

[1] *Data Breach Resources*, TRANSUNION, https://www.transunion.com/data-breach-resources (last accessed Sep. 3, 2025).
[2] *Id*.

and Class members, including their names, dates of birth, Social Security numbers, billing addresses, email addresses, phone numbers, reasons for customer transactions (such as requests for a free credit report), and customer support tickets and messages.[3]

***Defendant Knew that Criminals Target PII***

23. At all relevant times, Defendant knew, or should have known, that the PII it collects and stores was a target for malicious actors, as evidenced by the representations it makes on its website. Despite such knowledge, TransUnion failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII from unauthorized disclosures and cyberattacks that they should have anticipated and guarded against.

24. It is well known among companies that store sensitive personally identifiable information that such information—such as the PII stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[4]

25. PII is a valuable property right.[5] The value of PII as a commodity is measurable.[6] "Firms are now able to attain significant market valuations by employing business models

---

[3] *See* Kurt Knutsson, *TransUnion becomes latest victim in major wave of Salesforce-linked cyberattacks, 4.4M Americans affected*, FOX NEWS (Aug. 31, 2025, 12:51pm EDT), https://www.foxnews.com/tech/transunion-becomes-latest-victim-major-wave-salesforce-linked-cyberattacks-4-4m-americans-affected.

[4] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[5] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[6] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

predicated on the successful use of personal data within the existing legal and regulatory frameworks."[7] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[8] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

26. As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims. One such example is the development of "Fullz" packages, where cybercriminals connect data from a data breach with information from other sources to create a complete dossier on an individual, which can then be sold multiple times and used to commit a variety of fraud.[9]

27. Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and

---

[7] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[8] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[9] *See* Julia Kagan, *Fullz: Definition, Examples, Minimizing Risk*, INVESTOPEDIA (Aug. 31, 2022), https://www.investopedia.com/fullz-definition-4684000.

accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[10]

28. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

***Theft of PII Has Grave and Lasting Consequences for Victims***

29. Theft of PII can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[11] [12]

30. TransUnion itself recognizes that data breaches can cause significant harm to consumers. On its website, TransUnion lists the consequences of a data breach, which it states includes financial, reputational, and emotional consequences.[13] For financial consequences, TransUnion admits, "Your financial information could be used for unauthorized purchases or to fraudulently obtain a loan, which can affect your credit."[14]

---

[10] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[11] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Sep. 3, 2025).

[12] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[13] *See Data Breach Resources*, *supra* note 1.

[14] *Id*.

31. Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[15]

32. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[16]

33. There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[17]

34. It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

[15] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[16] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Sep. 3, 2025).

[17] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

### *Damages Sustained by Plaintiff and Class Members*

35. Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the disclosure, compromise, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendant's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach.

## CLASS ALLEGATIONS

36. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

37. Plaintiff brings this action on behalf of himself and all members of the following Class of similarly situated persons:

> All persons whose personally identifiable information was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach.

38. Plaintiff also brings this action on behalf of himself and all members of the following subclass (the "California Subclass")

> All citizens of California whose personally identifiable information was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach.

39. Excluded from the Class are Trans Union LLC, and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge.

40. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

41. The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. TransUnion reported to the Maine Attorney General's Office that the Data Breach affected approximately 4,461,511 persons.[18]

42. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII from unauthorized access and disclosure;

b. Whether Defendant had a duty not to disclose the PII of Plaintiff and Class members to unauthorized third parties;

c. Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII;

d. Whether Defendant breached those duties to protect Plaintiff's and Class members' PII; and

e. Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

43. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

---

[18] *See Data Breach Notifications*, OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/3dcd9b7c-bce3-4685-bffd-f728ce96e2fd.html (last accessed Sep. 3, 2025).

44. Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his PII compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

45. Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that he has no interests adverse to, or that conflict with, the Class he seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

46. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress from Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

## COUNT I
## NEGLIGENCE

47. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

48. TransUnion owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting the PII it collected and stored.

49. TransUnion knew or should have known the risks of collecting and storing Plaintiff's and all other Class members' PII, and the importance of maintaining secure systems. TransUnion knew or should have known of the many data breaches that targeted companies that collect and store PII in recent years.

50. Given the nature of TransUnion's business, the sensitivity and value of the PII it collects and maintains, and the resources at its disposal, TransUnion should have identified the vulnerabilities to its systems or the third-party applications it uses and prevented the Data Breach from occurring.

51. TransUnion breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to it—including Plaintiff's and Class members' PII.

52. It was reasonably foreseeable to TransUnion that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would

result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII to unauthorized individuals.

53. But for TransUnion's negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, the Data Breach would not have occurred and their PII would not have been compromised.

54. As a result of TransUnion's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in TransUnion's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach.

## COUNT II
## NEGLIGENCE PER SE

55. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

56. TransUnion's duties arise from Section 5 of the FTC Act ("FTC Act"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by business, such as TransUnion, of failing to employ reasonable measures to protect and secure PII.

57. TransUnion violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and other Class members' PII, by failing to provide timely notice, and by not complying with applicable industry standards. TransUnion's conduct was particularly unreasonable given the nature and amount of PII it obtains and stores, and the foreseeable consequences of a data breach involving PII including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

58. TransUnion's violation of Section 5 of the FTC Act constitutes negligence per se.

59. Plaintiff and Class members are within the class of persons that Section 5 of the FTC Act were intended to protect.

60. The harm occurring as a result of the Data Breach is the type of harm that Section 5 of the FTC Act were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and Class members as a result of the Data Breach.

61. It was reasonably foreseeable to TransUnion that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to, or failing to ensure that its third-part vendors, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII to unauthorized individuals.

62. The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of TransUnion's violations of Section 5 of the FTC Act. Plaintiff and

Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in TransUnion's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach.

## COUNT III
## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
## Cal. Bus. & Prof. Code §§ 17200, *et seq*.
## *On Behalf of the California Subclass*

63. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

64. Plaintiff brings this claim individually and on behalf of the California Subclass.[19]

65. The California Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq.*, prohibits any "unlawful," "fraudulent" or "unfair" business act or practice, as those terms are defined by the UCL and relevant case law. By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, TransUnion engaged in unlawful and unfair practices within the meaning, and in violation of, the UCL.

[19] As used in this claim, "Class members" refers to members of the California Subclass.

66. In the course of conducting its business, TransUnion committed "unlawful" business practices by, *inter alia*, knowingly failing to, or knowingly failing to ensure its third-party vendors, design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class members' PII, and by violating the statutory and common law alleged herein, including, *inter alia*, the FTC Act and Article I, Section 1 of the California Constitution (right to privacy). Plaintiff and Class members reserve the right to allege other violations of law by Defendant constituting other unlawful business acts or practices. TransUnion's above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

67. TransUnion's above-described wrongful actions, inaction, want of ordinary care, practices, and non-disclosures also constitute "unfair" business acts and practices in violation of the UCL in that TransUnion's wrongful conduct is substantially injurious to consumers, offends legislatively-declared public policy, and is immoral, unethical, oppressive, and unscrupulous. TransUnion's practices are also contrary to legislatively declared and public policies that seek to protect PII and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws such as the Article I, Section 1 of the California Constitution (right to privacy) and the FTC Act. The gravity of Defendant's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further TransUnion's legitimate business interests other than engaging in the above-described wrongful conduct.

68. The injury and harm that Plaintiff and Class members suffered were the direct and proximate result of TransUnion's violations of the UCL. Plaintiff and Class members

have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in TransUnion's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach.

69. Unless restrained and enjoined, Defendant will continue to engage in the above-described wrongful conduct and more data breaches will occur. Plaintiff, therefore, on behalf of himself, Class members, and the general public, also seeks restitution and an injunction prohibiting TransUnion from continuing such wrongful conduct, and requiring Defendant to modify its corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the PII entrusted to it, as well as all other relief the Court deems appropriate, consistent with California Business and Professions Code section 17203.

**COUNT IV**
**VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT OF 2018**
**Cal. Civ. Code §§ 1798.100 et seq. ("CCPA")**
***On Behalf of the California Subclass***

70. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

71. Plaintiff brings this claim individually and on behalf of the California

Subclass.[20]

72. Section 1798.150(a)(1) of the CCPA provides: "Any consumer whose nonencrypted or nonredacted personal information, as defined [by the CCPA] is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

73. Plaintiff is a "consumer" as defined by Civ. Code § 1798.140(g) because he is a "natural person who is a California resident, as defined in Section 17014 of Title 18 of the California Code of Regulations, as that section read on September 1, 2017."

74. TransUnion is a "business" as defined by Civ. Code § 1798.140(c) because it:

a. is a "sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners";

b. "collects consumers' personal information, or on the behalf of which is collected and that alone, or jointly with others, determines the purposes and means of the processing of consumers' personal information";

c. does business in and is headquartered in California; and

d. has annual gross revenues in excess of $25 million; annually buys, receives for the business' commercial purposes, sells or shares for

[20] As used in this claim, "Class members" refers to members of the California Subclass.

commercial purposes, alone or in combination, the personal information of 50,000 or more consumers, households, or devices; or derives 50 percent or more of its annual revenues from selling consumers' personal information.

75. Plaintiff's PII was subject to unauthorized access and exfiltration, theft or disclosure because of TransUnion's inadequate security measures.

76. Plaintiff's PII was in nonencrypted and nonredacted form, allowing criminals full access to it.

77. The Data Breach occurred as a result of TransUnion's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information. TransUnion failed to implement, or ensure that its third-party vendors had implemented, reasonable security procedures to prevent unauthorized access of Plaintiff's and Class members' PII as a result of a cyber-attack.

78. As a result of TransUnion's failure to implement and maintain reasonable security procedures and practices that resulted in the Data Breach, Plaintiff seeks injunctive and declaratory relief and any other relief as deemed appropriate by the Court.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in his favor and against Defendant as follows:

A. Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: September 3, 2025

Respectfully submitted,

/s/ Ben Barnow
Ben Barnow (IL Bar No. 0118265)
Anthony L. Parkhill (IL Bar No. 6317680)
Riley W. Prince (IL Bar No. 6339536)
Nicholas W. Blue (IL Bar No. 6343317)
**BARNOW AND ASSOCIATES, P.C.**
Cook County Attorney No. 38957
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312-621-2000
Fax: 312-641-5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com
rprince@barnowlaw.com

nblue@barnowlaw.com

*Counsel for Plaintiff*